UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

In re:

STEVEN PIXLEY,

        Debtor.

_____/

Case No. 10-62556
Chapter 7
Judge Thomas J. Tucker

JOYCE McCALLUM,

        Plaintiff,

v.

STEVEN PIXLEY,

        Defendant.

_____/

Adv. No. 10-6665

**TRIAL OPINION**

## I. Introduction

In this adversary proceeding, Plaintiff Joyce McCallum seeks a determination that

Defendant Debtor Steven Pixley's judgment debt to McCallum is non-dischargeable under 11

U.S.C. § 523(a)(2)(A) for fraud, and under 11 U.S.C. § 523(a)(6) for "willful and malicious

injury." Eighteen months before Pixley filed his Chapter 7 bankruptcy petition, McCallum

obtained a default judgment against Pixley in the Tuscola County, Michigan Circuit Court, in the

amount of $157,028.03, plus costs and interest.

The state court default judgment was entered after Pixley failed to answer McCallum's

complaint. Pixley did not defend or participate in any way in the state court action, and never

appealed or sought relief in the state court from the default judgment. The default judgment

granted judgment for McCallum on all counts of McCallum's state court complaint, including

counts for fraud and conversion.

Before trial in this adversary proceeding, McCallum moved for summary judgment, arguing that collateral estoppel precluded Pixley from contesting that his debt to McCallum was nondischargeable under §§ 523(a)(2)(A) and 523(a)(6). The Court denied McCallum's motion for summary judgment, for reasons explained at length in a published opinion. *McCallum v. Pixley* (*In re Pixley*), 456 B.R. 770 (Bankr. E.D. Mich. 2011).

The Court then held a bench trial, after which the parties filed post-trial briefs regarding certain issues. The Court has considered all of the arguments and evidence presented by the parties at trial, as well as the post-trial briefs. This opinion states the Court's findings of fact and conclusions of law.

For the reasons stated in this opinion, the Court finds for Plaintiff McCallum, and will enter a judgment in her favor, determining that Pixley's entire judgment debt to McCallum is nondischargeable under 11 U.S.C. § 523(a)(6).

## II. Jurisdiction

This Court has subject matter jurisdiction over this adversary proceeding under 28 U.S.C. §§ 1334(b), 157(a) and 157(b)(1), and Local Rule 83.50(a)(E.D. Mich.). This is a core proceeding under 28 U.S.C. § 157(b)(2)(I).

## III. Background and facts

### A. Stipulated facts

Initially, the Court finds the following facts, which the parties have stipulated to:[1]

---

[1] These are quoted from the written stipulations made by the parties, contained in the Final Pretrial Order (Docket # 61) at 3 ¶ 4.

A.    In 2007, Plaintiff entered into an agreement with debtor whereby debtor's company would convert a Chrysler 300 automobile to a limousine for the Plaintiff;

B.    In 2008, Plaintiff sued debtor in the 54th Circuit Court for Tuscola County Michigan;

C.    Defendant did not answer the State Court Complaint;

D.    A default was entered against defendant on June 25, 2008;

E.    A motion for a default judgment was filed on December 12, 2008 by Plaintiff against debtor;

F.    On January 21, 2009, a default judgment was entered against debtor in the amount of $157,028.03 which included treble damages due to debtor's liability for statutory conversion;

G.    Debtor has not paid the state court judgment[.]

## B.  Collateral estoppel and the Court's summary judgment decision

There are collateral estoppel issues that remain to be decided now, after the trial of this case.  Because collateral estoppel was discussed extensively in the Court's summary judgment opinion, the Court will describe some of its rulings made in the summary judgment opinion.

To begin with, the Court reiterates, and incorporates by reference into this opinion, the Court's opinion denying McCallum's motion for summary judgment.  Next, some of the key points from the Court's summary judgment opinion are described here, because they are relevant to the Court's decision now.

First, the Court stated the following general principles in its summary judgment opinion, regarding the doctrine of collateral estoppel:

> Collateral estoppel applies in nondischargeability proceedings under the Bankruptcy Code, such as this adversary proceeding.

*Grogan v. Garner*, 498 U.S. 279, 284 n.11 (1991). "Collateral estoppel . . . prevents a party from relitigating issues of fact or law which were necessarily decided by a previous final judgment." *Smith v. Sushka*, 117 F.3d 965, 969 (6th Cir. 1997). In determining whether a state court judgment precludes relitigation of issues under the doctrine of collateral estoppel, the Full Faith and Credit Statute, 28 U.S.C. § 1738, requires bankruptcy courts to "'consider first the law of the State in which the judgment was rendered to determine its preclusive effect.'" *Bay Area Factors v. Calvert* (*In re Calvert*), 105 F.3d 315, 317 (6th Cir. 1997)(quoting *Marrese v. Am. Acad. of Orthopaedic Surgeons*, 470 U.S. 373, 375 (1985)). If the state courts would not deem the judgment binding under collateral estoppel principles, then the bankruptcy court cannot do so either. But if the state courts would give preclusive effect to the judgment, then the bankruptcy court must also give the judgment preclusive effect, "unless Congress has expressly or impliedly created an exception to § 1738 which ought to apply to the facts before the federal court." *Id.* (citing *Marrese*, 470 U.S. at 386).

In *Calvert*, the Sixth Circuit held that there is no such express or implied exception under § 1738 in dischargeability actions. The court found no indication of such an exception "in the Bankruptcy Code or legislative history." And the court reasoned that there is "no principled distinction between cases where a defendant participates in part in defense of the state court suit and cases where the defendant does not respond at all." 105 F.3d at 322. The court held that "collateral estoppel applies to true default judgments in bankruptcy dischargeability proceedings in those states which would give such judgments that effect." Therefore, the Court must look to the law of Michigan to determine the collateral estoppel effect of the default judgment in this adversary proceeding.

Under Michigan law, the following requirements must be met in order for collateral estoppel to apply:

1) there is identity of parties across the proceedings,

2) there was a valid, final judgment in the first proceeding,

3) the same issue was actually litigated and necessarily determined in the first proceeding, and

4

> 4) the party against whom the doctrine is asserted had a full and
> fair opportunity to litigate the issue in the earlier proceeding.
>
> *Phillips v. Weissert* (*In re Phillips*), 434 B.R. 475, 485 (B.A.P. 6th
> Cir. 2010)(citation omitted).

*McCallum*, 456 B.R. at 775-76 (footnote omitted).

Second, after discussing the federal and Michigan case law on the issue, this Court held

in its summary judgment opinion that under Michigan law, a "true default" judgment is given

preclusive effect under the doctrine of collateral estoppel:

> The Court holds that under Michigan law a "true default"
> judgment, like the one in this case, meets Michigan's "actually
> litigated" requirement, and must be given preclusive effect under
> the doctrine of collateral estoppel. "Substantial participation" by
> the defendant in the state court case is not necessary in order for
> collateral estoppel to apply. No participation is necessary.

*Id.* at 777.

Third, this Court discussed the "actually litigated" and "necessarily determined"

requirements for collateral estoppel to apply under Michigan law, and what those requirements

mean:

> Under Michigan law, an issue is "actually litigated" if it is "put
> into issue by the pleadings, submitted to the trier of fact for
> determination, and is thereafter determined." *Phillips*, 434 B.R. at
> 486 (majority opinion)(*quoting Latimer v. William Mueller & Son,
> Inc.*, 386 N.W.2d 618, 627 (Mich. Ct. App. 1986)); *Phillips*, 434
> B.R. at 490 (Rhodes, J., concurring) (same). This Court agrees
> with the concurring opinion in *Phillips* that "[a]n issue may be
> actually litigated without a trial;" *id.*, and that:
>
>> Under Michigan law, "the entry of a default
>> judgment is equivalent to an admission by the
>> defaulting party as to all of the matters well
>> pleaded." *Sahn v. Brisson's Estate,* 43 Mich.App.
>> 666, 204 N.W.2d 692, 694 (1972); *Lesisko v.*

5

> *Stafford,* 293 Mich. 479, 292 N.W. 376, 377 (1940).
> **The only matters that are not considered actually
> litigated are those not pled.**

> *Id.* at 492 (Rhodes, J., concurring)(emphasis added).

> An issue that is "actually litigated" is also considered to be
> "necessarily determined" if "it is necessary to the judgment." *See
> id.* at 493; *see also Rohe Scientific Corp. v. Nat'l Bank of Detroit*,
> 350 N.W.2d 280, 282 (Mich. Ct. App. 1984)(citation
> omitted)("Collateral estoppel applies to default judgments;
> however the default judgment is conclusive only as to those
> matters essential to support the judgment."); *Detroit Automobile
> Inter-Insurance Exchange v. Higginbotham*, 290 N.W.2d 414, 418
> (Mich. Ct. App. 1980)(same). Whether an "actually litigated"
> issue is also "necessary to the judgment," or "essential to the
> judgment," in turn, depends on the elements of the claim or
> defense involved.

*Id.* at 778-79.

Fourth, the Court noted that "[i]t is clear, and undisputed, that the existence and amount of Pixley's debt to McCallum were both 'actually litigated and necessarily determined' by the default judgment." *Id.* at 778. But, the Court noted, "as to both § 523(a)(2)(A) and § 523(a)(6), the parties dispute whether all of the elements of non-dischargeability were both 'actually litigated and necessarily determined' by the default judgment." *Id.*

Fifth, the Court ruled that two of the necessary elements of McCallum's § 523(a)(2)(A) nondischargeability claim were *not* "actually litigated" in the state court default judgment, because they were not pled in McCallum's state court complaint. These are the elements that (1) an alleged misrepresentation by Pixley was "material;" and (2) that McCallum's actual reliance on an alleged misrepresentation was "justifiable."[2] *See id.* at 782-85, 784 n.14. As a result,

---

[2] The Court stated the elements of a § 523(a)(2)(A) nondischargeabilty claim in its summary judgment opinion, 456 B.R. at 779, as follows:

McCallum could not obtain a summary judgment of nondischargeability under § 523(a)(2)(A), based on collateral estoppel.

Sixth, the Court ruled that all of the necessary elements of McCallum's § 523(a)(6) nondischargeability claim, for "willful and malicious injury," were "actually litigated" in the state court default judgment, because they were pled in McCallum's state court complaint. *Id.* at 785-87. But the Court ruled that the willfulness element under § 523(a)(6) was *not* "necessarily determined" by the state court default judgment. *Id.* at 787-90. This is because under both Michigan common law and Michigan's conversion statute, Mich. Comp. Laws § 600.2919a, "the tort of conversion does not require an intent to violate the property rights of another, or knowledge that one is violating the property rights of another. Rather, the tort can be committed

---

Section 523(a)(2)(A) makes nondischargeable:

> any debt —
> . . .
>
> for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by . . . false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition[.]

11 U.S.C. § 523(a)(2)(A). The Sixth Circuit has described the elements of nondischargeability under § 523(a)(2)(A) in this way:

> In order to except a debt from discharge under § 523(a)(2)(A), a creditor must prove the following elements: (1) the debtor obtained money through a material misrepresentation that, at the time, the debtor knew was false or made with gross recklessness as to its truth; (2) the debtor intended to deceive the creditor; (3) the creditor justifiably relied on the false representation; and (4) its reliance was the proximate cause of loss.

*Rembert v. AT&T Universal Card Servs., Inc.* (*In re Rembert*), 141 F.3d 277, 280-81 (6th Cir. 1998)(footnote and citation omitted).

7

'unwittingly'." *Id*. at 788. Thus, the Court concluded as follows:

> The Court concludes that Pixley's liability for conversion under the Michigan conversion statute — specifically, Mich. Comp. Laws § 600.2919a(1)(a) — did not require an allegation or proof that Pixley intended to violate McCallum's property rights, or that he knowingly did so. As a result, the Court concludes that the allegations in the State Court Complaint that amount to an allegation that the injury to McCallum was "willful" within the meaning of § 523(a)(6) — *i.e.*, that Pixley intended to cause injury to McCallum, or knew that his actions would cause injury to McCallum, or believed that his actions would cause or were substantially certain to cause injury to McCallum — were not "necessary to" or "essential to support" the default judgment for conversion under Michigan law.
>
> . . .
>
> [T]he issue of whether Pixley's injury to McCallum's property was "willful" was not "necessarily determined" by the default judgment against Pixley. As a result, the Court cannot grant summary judgment for McCallum on her non-dischargeability fraud claim under § 523(a)(6), based on collateral estoppel.

*Id.* at 788-90.

## IV. Discussion

### A. Update on the "true default" issue

As noted above, in its summary judgment opinion, this Court held that under Michigan law, a "true default" judgment is given preclusive effect under the doctrine of collateral estoppel. To supplement and update its discussion of that point in its summary judgment opinion, the Court now adds the following.

In a case decided after this Court filed its summary judgment opinion, the Bankruptcy Appellate Panel for the Sixth Circuit expressed doubt about whether Michigan law gives preclusive effect to *any* default judgment under the doctrine of collateral estoppel. In *Dantone v.*

8

*Dantone* (*In re Dantone*), 477 B.R. 28 (B.A.P. 6th Cir. 2012), the court quoted from a 1990

Michigan Supreme Court decision, *Lichon v. Am. Universal Ins. Co.*, 459 N.W.2d 288 (Mich.

1990), as suggesting that under Michigan law, a default judgment is given no preclusive effect,

because nothing is deemed to have been "actually litigated." *See* 477 B.R. at 36-37. The court in

*Dantone* further noted that "Michigan bankruptcy courts appear to have overlooked *Lichon* in

ruling on the preclusive effect of default judgments by Michigan state courts." *Id.* at 37.

*Dantone* said the following about the *Lichon* case:

> [T]he Panel requested supplemental briefing on the issue of
> whether a default judgment meets the "actually litigated"
> requirement for issue preclusion because it appears that the
> Michigan Supreme Court may not give issue preclusive effect to
> such judgments. In *Lichon v. American Universal Insurance Co.*,
> 435 Mich. 408, 459 N.W.2d 288 (1990), the Michigan Supreme
> Court indicated that a default judgment is not entitled to preclusive
> effect because none of the issues is actually litigated. *Id*. at 299.
> The Michigan Supreme Court quoted with approval from comment
> e of 27 of the Second Restatement of Judgments:
>
>> Under 1 Restatement Judgments, 2d, § 27, p. 250,
>> collateral estoppel applies "[w]hen an issue of fact
>> or law is actually litigated and determined by a valid
>> and final judgment . . . ." Comment e to this section
>> clarifies this rule: "A judgment is not conclusive in
>> a subsequent action as to issues which might have
>> been but were not litigated and determined in the
>> prior action."
>>
>> . . . .
>>
>> Comment e of the Restatement Judgments, 2d, § 27,
>> p. 257, further indicates that "[i]n the case of a
>> judgment entered by confession, consent, or default,
>> none of the issues is actually litigated."
>
> *Id*. at 298-99 (internal citation omitted). Given the Michigan
> Supreme Court's favorable citations to § 27 of the Second

9

Restatement of Judgments and to comment e in particular, and given no later case law from the Michigan Supreme Court repudiating this pronouncement, it seems fair to conclude that a default judgment entered by a state court in Michigan generally has no issue preclusive effect. . . .

Michigan bankruptcy courts appear to have overlooked *Lichon* in ruling on the preclusive effect of default judgments by Michigan state courts. *See In re Phillips*, 434 B.R. at 486 (detailing disagreement among courts regarding the preclusive effect of default judgments and collecting cases). However, the Panel concludes that it need not decide whether the state court judgment at issue in this case was actually litigated because Debtor conceded the element of "actually litigated" in briefing before the bankruptcy court.

477 B.R. at 36-37 (citation omitted).

To date, one other case from this district has pointed out that the foregoing discussion in *Dantone* is dictum, and also has disagreed with *Dantone's* interpretation of the *Lichon* case. *See Comerica Bank v. Kory* (*In re Kory*), No. 11-7099, 2013 WL 1340215, at *3 (Bankr. E.D. Mich. March 28, 2013)(Shapero, J.).[3]

_____

[3] Among other things, the court in *Kory* stated:

[W]ith all due respect to the *In re Dantone* court, it appears that its reliance on *Lichon* is misplaced.
. . .

*Lichon* does not deal with default judgments, as *In re Dantone* suggests it does. *Lichon's* essential holding was that collateral estoppel does not preclude a man who previously pled *nolo contendere* to a crime from raising the defense that he did not commit that act in a subsequent civil suit. In reaching this conclusion, the *Lichon* court discussed at length the nature and rationale of the *nolo contendere* plea, but did not discuss default judgments as *In re Dantone* suggests. There are important distinctions between a *nolo contendere* plea and a default judgment, both conceptually and procedurally. It is perhaps possible for one to seek to liken the two because neither seems to involve "actual litigation" of an issue on its merits. But neither the *Lichon* nor the *In re Dantone* courts actually engaged in this analysis nor actually decided the point.

In addition, the above cited dictum in *Dantone* is simply incorrect about Michigan law.[4]

First and foremost, *Dantone* overlooked the fact that in a case decided sixteen years after *Lichon*,

the Michigan Supreme Court explicitly held that a default judgment *is* to be given preclusive

effect under the doctrine of collateral estoppel. *See Barnes v. Jeudevine*, 718 N.W.2d 311, 315

(Mich. 2006). So even if the 1990 decision in *Lichon* stands for a contrary position, that position

is no longer the law of Michigan, given the 2006 decision in *Barnes*.

The holding of *Barnes* was noted by the court in *Kory*, 2013 WL 1340215, at *2, and was

also explained, at length, in the concurring opinion in *Phillips v. Weissert* (*In re Phillips*), 434

B.R. 475 (B.A.P. 6th Cir. 2010):

> In ***Barnes v. Jeudevine,*** **475 Mich. 696, 718 N.W.2d 311 (2006),
> the court unequivocally stated, "[a] default judgment is just as
> conclusive an adjudication and as binding upon the parties of
> whatever is essential to support the judgment as one which has
> been rendered following answer and contest."** *Id.* at 315 (citing
> and quoting with approval, *Perry & Derrick Co. v. King,* 24
> Mich.App. 616, 180 N.W.2d 483, 485 (1970)). **This is the
> strongest possible indication that the Michigan Supreme Court
> does not distinguish among judgments, whether entered by
> default or otherwise, in applying the preclusive effect of the
> collateral estoppel doctrine.**
>
> In *Barnes,* the plaintiff alleged that he was the biological father of a
> child that was conceived while the child's mother was married to
> another man and that was born four months after the mother's
> divorce. The mother's default judgment of divorce stated that it
> appeared that "no children were born of this marriage and none are
> expected." The question presented was whether that finding
> precluded the mother from asserting that her ex-husband was the

---

2013 WL 1340215, at *3.

[4] As this Court noted previously in its summary judgment opinion, *McCallum*, 456 B.R. at 777
n.3 (and as held by cases cited therein), decisions of the Bankruptcy Appellate Panel are not binding on
this Court as a matter of *stare decisis*.

father and whether the plaintiff was therefore precluded from asserting paternity under the Michigan Paternity Act, Mich. Comp. Laws § 722.711, and the case law construing that Act. The question turned on whether the finding in the divorce judgment was a sufficient finding that the child was not the issue of the marriage. The court held that it was not a sufficient determination and that therefore the plaintiff lacked standing to assert paternity. In so holding, the court relied on its prior decision in *Girard v. Wagenmaker,* 437 Mich. 231, 470 N.W.2d 372 (1991), which held that "in order for a biological father to establish standing under the Paternity Act, there must be a 'prior court determination that a child is born out of wedlock.'" *Barnes,* 718 N.W.2d at 314 (quoting *Girard,* 470 N.W.2d at 372). The court held that the language in the divorce judgment was simply not a prior determination that the child was born out of wedlock.

What is important here is that although the Michigan Supreme Court rejected the plaintiff's collateral estoppel argument, it did so only because the question of the child's paternity had not been determined in the prior divorce judgment. It did not reject the collateral estoppel argument because the prior divorce judgment was a default judgment. **Indeed, as noted above, the court explicitly stated that a default judgment is entitled to the same preclusive effect as a judgment that follows an answer and a contest. Because the Michigan Supreme Court so held, we are bound to that holding in applying collateral estoppel in a nondischargeability action.**

434 B.R. at 491-92 (Rhodes, J., concurring)(emphasis added).

Because of the *Barnes* case, this Court concludes that *Dantone* is incorrect in its reading

of Michigan law. This is further confirmed by other Michigan cases, decided after *Barnes*, and

which cite *Barnes* in holding that a default judgment is given preclusive effect. *See, e.g.*, *Reed*

*Estate v. Reed*, 810 N.W.2d 284, 292 and n.30 (Mich. Ct. App. 2011)(citing *Barnes* for the

proposition that "[a] long history of caselaw recognizes that default judgments are conclusive

adjudications and are as binding on the litigants as judgments obtained following a trial or

settlement."); *Fair v. Moody*, No. 278906, 2008 WL 5382648, at *11 (Mich. Ct. App. Dec. 23,

12

2008)(unpublished)(same); *see also Eager v. Credit Bureau Collection Services, Inc.*, Nos. 1:13-CV-30, 1:13-CV-84, 1:13-CV-159, 1:13-CV-173, 1:13-CV-261, 1:13-CV-267, 1:13-CV-341, 2013 WL 5719224, at *3 and n.6 (W.D. Mich. Oct. 18, 2013); *Fifth Third Bank v. U.S. Dep't of Agriculture-Rural Dev.*, No. 1:12-CV-1123, 2013 WL 529858, at *3 (W.D. Mich. Feb. 11, 2013).

Of the cases just cited, the federal district court in *Eager* cited *Barnes* as "the most authoritative source on whether a true default judgment (based on the defendant's failure to appear or otherwise defend) fulfills the actually litigated requirement under Michigan law," and held that such a "true default judgment" *does* satisfy the "actually litigated" requirement. *Eager*, 2013 WL 5719224, at *3 n.6.

Based on these cases, and based on the other cases discussed in the Court's summary judgment opinion, 456 B.R. at 777-78,[5] the Court reiterates its previous holding that a true

_____

[5] Among other things, the Court noted the following in its summary judgment opinion:

> The Court reaches this conclusion based on the arguments and authorities presented in Judge Rhodes's concurring opinion in *Phillips*, which the Court finds persuasive, and also based on the following two points.

> First, at least two published Michigan Court of Appeals cases have applied collateral estoppel based on a "true default" judgment (*i.e.*, a default judgment entered after the defendant did not answer, defend, or participate in any way in the case). *See Sahn v. Estate of Brisson*, 204 N.W.2d 692, 693-94 (Mich. Ct. App. 1973); *Braxton v. Litchalk*, 223 N.W.2d 316, 318, 320 (Mich. Ct. App. 1974).

> Second, the Court is not aware of any published Michigan appellate decision that has refused to apply collateral estoppel to a default judgment for the reason that it was entered without participation in the case by the defaulted defendant.

(footnote, discussing the *Sahn* and *Braxton* cases at length, omitted).

13

default judgment is to be given preclusive effect under Michigan law of collateral estoppel.[6]

**B.  The remaining unresolved dispute about collateral estoppel**

There remains a further dispute between the parties about collateral estoppel.  As described above, the Court ruled in its summary judgment opinion that collateral estoppel does not preclude Pixley from contesting certain specific elements of McCallum's §§ 523(a)(2)(A) and 523(a)(6) nondischargeability claims, because those specific elements were not both "actually litigated" and "necessarily determined" in the state court default judgment.  Pixley now argues that because of this, he is not precluded from contesting *any* of the nondischargeability elements.  In effect, Pixley now argues that collateral estoppel drops out of the case entirely.  Pixley states the argument this way in his post-trial brief: "[c]ollateral estoppel may be applied to a valid and final judgment on an all or nothing basis; collateral estoppel does not apply to conclusively establish only certain elements for a cause of action . . . ."[7]

---

[6]  This conclusion is further supported directly by the Michigan case of *Perry & Derrick Co., Inc. v. King,* 180 N.W.2d 483, 485 (Mich. Ct. App. 1970), which was quoted with approval in the *Barnes* case.  In *King,* the prior judgment on which collateral estoppel preclusion was applied was a true default judgment — *i.e.*, the corporate defendant in the prior action had not answered the complaint or otherwise participated in the case in any way before the default judgment was entered against it.  *King,* 180 N.W.2d at 484.  It was in this context, of a true default judgment, that the Michigan Court of Appeals held as follows:

> The fact that the original judgment against the flour company was obtained through default does not affect the result we now reach. A default judgment is just as conclusive an adjudication and as binding upon the parties of whatever is essential to support the judgment as one which has been rendered following answer and contest. As is true with a judgment on the merits, a default judgment will bar a second suit between the same parties and their privies on the same cause of action.

*Id.* at 485-86.

[7]  Def.'s Post-Trial Br. (Docket # 89) at 2.

McCallum, on the other hand, argues that Pixley is precluded by collateral estoppel from contesting all those elements of nondischargeability that *were* both actually litigated and necessarily determined in the state court default judgment. This is so, McCallum argues, even if *some* of the nondischargeability elements were not actually litigated and necessarily determined in the default judgment. Thus, McCallum disputes Pixley's argument that collateral estoppel is an all-or-nothing proposition. As McCallum puts it, collateral estoppel preclusion "is not limited to entire judgments but is appropriately applied to issues within a prior judgment."[8]

McCallum is correct. First, Pixley has cited no authority that supports his "all or nothing" view of collateral estoppel. Pixley argues that this is how the doctrine is applied in the Sixth Circuit,[9] but cites no case that actually says that or demonstrates that. Rather, the Sixth Circuit has taken an issue-by-issue approach to collateral estoppel, not Pixley's all-or-nothing approach. In its summary judgment opinion in this case, for example, this Court quoted a 1997 Sixth Circuit case as follows:

> "Collateral estoppel . . . prevents a party from relitigating **issues of fact or law** which were necessarily decided by a previous final judgment." *Smith v. Sushka*, 117 F.3d 965, 969 (6th Cir. 1997).

*McCallum*, 456 B.R. at 775 (emphasis added).[10]

---

[8]  Pl.'s Post-Hearing Br. (Docket # 85) at 3.

[9]  Def.'s Post-Trial Br. (Docket # 89) at 4-5.

[10]  In his post-trial brief, Pixley cites the Sixth Circuit case of *Spilman v. Harley*, 656 F.2d 224 (6th Cir. 1981), but it is not at all apparent how *Spilman* supports Pixley's all-or-nothing approach to collateral estoppel. In any case, in *Bay Area Factors v. Calvert* (*In re Calvert*), 105 F.3d 315, 319 (6th Cir. 1997), the Sixth Circuit recognized that because *Spilman* applied the federal common law of collateral estoppel, it was implicitly overruled by *Marrese v. American Academy of Orthopaedic Surgeons*, 470 U.S. 373, 380 (1985), which "instructed federal courts [applying collateral estoppel to a state court judgment] to use the preclusion principles of the state where the judgment was entered and not to employ their own rules of preclusion."

15

A second problem with Pixley's argument is that Pixley gives no logical reason supporting his view of the law. Rather, Pixley's argument seems to confuse collateral estoppel, which is commonly known as "***issue*** preclusion," with the doctrine of *res judicata*, which is commonly known as "claim preclusion."

Third, Michigan cases cited by McCallum show that McCallum is correct. Those cases define collateral estoppel, and apply it, on an issue-by-issue basis. For example, in *People v. Gates*, 452 N.W.2d 627, 630 (Mich. 1990), the Michigan Supreme Court described collateral estoppel in this way:

> Collateral estoppel precludes relitigation of **an issue** in a subsequent, different cause of action between the same parties where the prior proceeding culminated in a valid, final judgment and **the issue** was (1) actually litigated, and (2) necessarily determined.

(Emphasis added) (footnote omitted) (citations omitted). Similarly, in *Hackley v. Hackley*, 395 N.W.2d 906, 910 (Mich. 1986), the Michigan Supreme Court described the concept of what it labeled as both "collateral estoppel" and "issue preclusion" in this way:

> "The general principle announced in numerous cases is that **a right, question or fact** distinctly put in issue and directly determined by a court of competent jurisdiction, as a ground of recovery, cannot be disputed in a subsequent suit between the same parties or their privies; and even if the second suit is for a different cause of action, **the right, question or fact** once so determined **must**, as between the same parties or their privies, **be taken as conclusively established**, so long as the judgment in the first suit remains unmodified."

(Emphasis added)(quoting, with approval, *United States v. Moser*, 266 U.S. 236, 241 (1924)).

Michigan's issue-based approach to collateral estoppel is consistent with the way bankruptcy courts generally have applied collateral estoppel in dischargeability actions. Case

16

law applies collateral estoppel to preclude litigation of one or more of the elements of a dischargeability claim, even where collateral estoppel does not bar litigation of other elements of the claim. *See, e.g.*, *In re Esposito*, 44 B.R. 817, 823-24, 826 (Bankr. S.D.N.Y. 1984). In *Esposito*, the bankruptcy court found that "while collateral estoppel [was] applicable to establish every other element of [the plaintiff creditors' claim under 11 U.S.C.] §[§] 523(a)(2)(A) and (B), namely that [the debtor] Esposito intentionally obtained the money through false representations and false financial statements, collateral estoppel [could not] be used to establish reasonable reliance. *Id.* At 824." The court nevertheless granted the plaintiffs' motion for summary judgment on the §§ 523(a)(2)(A) and (B) grounds in their complaint, because the reasonable reliance element was established by the factual attestations in the affidavits filed in support of the plaintiffs' motion for summary judgment, which were not refuted by Esposito.

For these reasons, the Court concludes that Pixley is precluded from contesting any of the nondischargeability elements that were both actually litigated and necessarily determined by the state court default judgment.

### C. Application of collateral estoppel to McCallum's § 523(a)(6) claim

As noted in part III-B of this opinion, and as the Court stated in its summary judgment opinion, "[i]t is clear, and undisputed, that the existence and amount of Pixley's debt to McCallum were both 'actually litigated and necessarily determined' by the [state court] default judgment." *See McCallum*, 456 B.R. at 778. Pixley's total debt to McCallum under the default judgment is $157,028.03, plus interest, as stated in the judgment.[11] It is clear from page 2 of the

---

[11] *See* Joint Exhibit 7 (the Default Judgment) at 2; Stipulated Facts F and G, quoted in Part III-A of this opinion. (Henceforth, the joint exhibits that were admitted into evidence at trial are cited in this opinion as "JX-_).

default judgment that this judgment amount consists of $50,600.00 in damages trebled, which

equals $151,800.00, plus attorney fees of $4,760.00 and costs of $468.03, for a judgment total of

$157,028.03. The default judgment granted judgment against Pixley on every count of

McCallum's six-count complaint, which included, in Count III, a claim for conversion under

Michigan's conversion statute, Mich. Comp. Laws § 600.2919a. The default judgment's trebling

of the damages was explicitly based on the conversion count and on Michigan's conversion

statute, and the judgment also awarded the attorney fees based on the conversion count and

conversion statute.

In its summary judgment opinion, this Court discussed McCallum's state court

conversion claim (Count III of the state court complaint) at length. *McCallum*, 456 B.R. at 785-

89; *see also id.* at 782-83. The Court incorporates that entire discussion here, by reference.

Briefly stated, the conversion claim was that McCallum paid Pixley a total of $50,600.00 toward

the purchase of a Chrysler 300 that was to be converted into a limousine, and that Pixley failed to

deliver the limousine and failed to return any of the $50,600.00 that McCallum had paid him.

Count III of McCallum's state court complaint alleged that Pixley converted the $50,600.00 that

McCallum had paid him. The default judgment determined, conclusively, that Pixley did convert

this $50,600.00 of McCallum's money.[12] *See, e.g.*, *Phillips v. Weissert* (*In re Phillips*), 434 B.R.

---

[12] Michigan law recognizes a cause of action for conversion of money under certain
circumstances, including, arguably at least, circumstances like those alleged in McCallum's state court
complaint. *See, e.g., Carpenters' Pension Trust Fund Detroit & Vicinity v. Laminate Creations*, 803
F.2d 718 (unpublished table decision), 1986 WL 17726, at *2, (6th Cir. 1986). In *Carpenters' Pension
Trust Fund*, the Court stated:

> [I]t is a settled principle of Michigan tort law that 'an action for
> conversion of money is not maintainable unless there is an obligation on
> the part of the defendant **to return or apply the specific money**
> **entrusted to his care**.' 'Though money is property which it is often

475, 485-87 (B.A.P. 6th Cir. 2010)(majority of B.A.P. panel holding that Michigan state court judgment must be given preclusive effect as to the defendant-debtor's tort liability and the amount of damages, even where collateral estoppel did not give preclusive effect on § 523(a)(6) non-dischargeability issue).

On this claim and legal theory, the default judgment held Pixley liable to McCallum for statutory conversion, and awarded judgment in the amounts described above. McCallum contends that Pixley's judgment debt for conversion is nondischargeable under 11 U.S.C. § 523(a)(6).

In its summary judgment opinion, this Court concluded that all of the necessary elements of McCallum's § 523(a)(6) nondischargeability claim, for "willful and malicious injury," were "actually litigated" in the state court default judgment, because they were pled in McCallum's state court complaint. *McCallum*, 456 B.R. at 785-87. But the Court ruled that the willfulness element under § 523(a)(6) was *not* "necessarily determined" by the state court default judgment. *Id.* at 787-90. This is because under both Michigan common law and Michigan's conversion statute, Mich. Comp. Laws § 600.2919a, "the tort of conversion does not require an intent to violate the property rights of another, or knowledge that one is violating the property rights of another. Rather, the tort can be committed 'unwittingly'." *Id.* at 788.

---

difficult to identify, it is well settled that an action of trover will lie for
its conversion when such identification is possible, and there is an
obligation to deliver the specific money in question.'

(Emphasis added) (citations omitted).

Of course, even if Pixley might have had a colorable argument that the circumstances alleged by
McCallum's state court complaint do not give rise to an action for conversion of money, Pixley forfeited
the right to make such an argument when he failed to timely answer the state court complaint and
suffered the default judgment. And Pixley has not argued otherwise in this adversary proceeding.

The Court did not rule, in its summary judgment opinion, whether the maliciousness element under § 523(a)(6) was "necessarily determined" by the state court default judgment.

The Court now reiterates and adopts the above conclusions from its summary judgment opinion. The Court now must determine, after trial, whether Pixley's conversion of McCallum's $50,600.00 was both "willful" and "malicious" as those terms are used in § 523(a)(6).

### D. The "willful" and "malicious" elements under § 523(a)(6)

The Court described the meaning of these § 523(a)(6) elements in its summary judgment opinion:

> In order to establish nondischargeability under § 523(a)(6), a creditor must show an injury to person or property by the debtor that is both "willful" and "malicious." "[T]o find a 'willful' injury under § 523(a)(6), [the court] must determine either that (i) the actor desired to cause the consequences of the act or (ii) the actor believed that the given consequences of his act were substantially certain to result from the act." *Monsanto Co. v. Trantham* (*In re Trantham*), 304 B.R. 298, 307 (B.A.P. 6th Cir. 2004)(citing *Markowitz v. Campbell* (*In re Markowitz*), 190 F.3d 455, 464 (6th Cir. 1999)). "Under § 523(a)(6), '"[m]alicious' means in conscious disregard of one's duties or without just cause or excuse; it does not require ill-will or specific intent.'" *Id.* at 308 (*quoting Wheeler v. Laudani*, 783 F.2d 610, 615 (6th Cir.1986)).

*McCallum*, 456 B.R. at 785.

### 1. "Willful"

As discussed above, the state court default judgment conclusively establishes that Pixley's failure to return to McCallum the $50,600.00 she had paid him, while simultaneously failing to deliver to McCallum the Chrysler 300 converted limousine that McCallum had paid the money for, was wrongful, and constituted a conversion of McCallum's $50,600.00. Based on (1) the facts established by the default judgment that Pixley is collaterally estopped to dispute;

20

and (2) the evidence presented at trial, the Court finds that Pixley knew that he had no right to simply keep McCallum's $50,600.00 without delivering the limousine. This was not a case of unwitting or innocent conversion by Pixley. Rather, Pixley knowingly and intentionally converted McCallum's money.

Certain basic facts relevant to McCallum's § 523(a)(6) claim are established by the default judgment. The following allegations of McCallum's state court complaint ("State Court Complaint"), described in the Court's summary judgment opinion,[13] are established by the default judgment:

> [McCallum's State Court Complaint] named as defendants Steven Pixley and Wolverine Coach Builders, LLC.[14] McCallum alleged that she made an agreement with the Defendants in August 2007, that Defendants would convert a Dodge Charger automobile into a limousine for McCallum's business and sell it to McCallum for the price of $59,000.00, payable in monthly installments. But the Defendants sold "Plaintiff's Dodge Charger limousine" to another customer, and then told McCallum of this.[15] In December 2007, the parties modified their contract to provide that Defendants would convert a Chrysler 300 automobile into a limousine for McCallum, in place of the Dodge Charger, for the same cont[r]act price of $59,000.00. McCallum made her required monthly payments to the Defendants, toward the $59,000.00 contract price, through March 2008, at which point Defendants had 14 days under the contract to complete the conversion of the Chrysler 300 automobile into a limousine. Under the contract, McCallum was to make a final payment of $10,000.00 upon completion of the

---

[13] The following quotation from the Court's summary judgment opinion carries forward the footnotes from that opinion, without change, except that the footnote numbers are revised to reflect the footnote numbering in this opinion. The quoted footnotes from the summary judgment opinion primarily contain citations to McCallum's State Court Complaint. That complaint was admitted into evidence at trial as JX-1.

[14] A copy of the state court complaint appears in Exhibit A to McCallum's Summary Judgment Motion (Docket # 9), and is cited in this opinion as the "State Court Complaint."

[15] State Court Complaint ¶¶ 10-11.

limousine and her receipt of a clear title to the vehicle.[16]

McCallum alleged that Defendants never delivered the limousine or title to the limousine to her, despite the fact that McCallum "was and remains ready to tender payment to Defendants in the amount of $10,900.00 to satisfy her financial obligations pursuant to the parties['] contract."[17] McCallum alleged that Defendants breached the contract by failing to deliver the limousine and clear title to the limousine, and that Defendants failed to return any of the money paid by McCallum under the contract, in the amount of $50,600.00.[18]

McCallum alleged that she later discovered "that a lien encumbers the title of the Chrysler 300 automobile which is held by Wells Fargo Bank in the amount of $15,190.03 as creditor, with Defendant Stephen Pixley named as the Debtor thereof."[19]

Next, McCallum alleged that Defendants "at all times were aware of the said lien but refused to inform [McCallum] of the presence of the lien while receiving payments for the conversion of the Chrysler 300," and that Defendants "intentionally misled [McCallum] with respect to the vehicle title."[20]

*McCallum*, 456 B.R. at 782-83. The collateral estoppel effect of the state court default judgment

is sufficient to conclusively establish these facts, regardless of what evidence was presented in

the trial of this adversary proceeding. The evidence presented at trial showed some facts that are

---

[16] *Id*. at ¶¶ 12-15.

[17] *Id*. at ¶ 16. This amount, $10,900.00, appears inconsistent with the $10,000.00 amount alleged in ¶ 15 of the State Court Complaint. In that paragraph, McCallum alleged that her final payment to Defendants upon completion of the limousine and delivery of title was to be $10,000.00.

[18] *Id*. at ¶ 16. It appears from the State Court Complaint allegations that McCallum still had $10,900.00 left to pay toward the $59,000.00 contract price. She alleged that she paid Defendants a total of $50,600.00. But this included a one-time late fee of $2,500.00, for making her March 2008 monthly payment late. This left a total of $10,900.00 to be paid toward the contract price of $59,000.00. ($50,600.00 - $2,500.00 = $48,100.00; $59,000.00 - $48,100.00 = $10,900.00.) *Id*. at ¶¶ 13, 16.

[19] *Id*. at ¶ 18.

[20] *Id*. at ¶¶ 19-20.

slightly different from the state court complaint allegations quoted above, but the differences are not material to this Court's dischargeability determination.

The evidence at trial established that as of December 2, 2007, the parties had agreed that the $59,000.00 contract price for the converted limousine was to be satisfied by payments from McCallum according to the following schedule: $10,000.00 previously paid; a $9,000.00 "down" payment; and three payments of $13,333.33, due on December 19, 2007, December 26, 2007, and when the vehicle was completed. The "completion date" of the vehicle was to be January 15, 2008.[21] McCallum paid the $9,000.00 "down" payment on December 2 or 3, 2007.[22] McCallum did not make the first two payments of $13,333.33 on time. Rather, she paid $15,000.00 by a bank check dated December 31, 2007, which Pixley received no later than January 3, 2008.[23] Pixley agreed to accept this late payment. And under the parties' December 2, 2007 agreement, the parties agreed, McCallum would owe a single late charge of $2,500.00 for her late payments.[24] Next, McCallum paid Pixley another $15,000.00, by a check dated March 15, 2008. The parties agree that McCallum made one other payment to Pixley, in cash, on April 7, 2008, in the amount of $1,600.00. Thus, McCallum's payments totaled $50,600.00.

Under the parties' contract, the total amount McCallum was to pay was $61,500.00 (the original $59,000.00 contract price plus the $2,500.00 late charge). So her $50,600.00 in payments left $10,900.00 still to pay.

---

[21] The terms are confirmed by JX-11, and the testimony of both McCallum and Pixley.

[22] McCallum testified that she paid this sum on December 2, 2007. JX-16 indicates that this sum was paid on December 3, 2007.

[23] *See* JX-12, JX-16; McCallum testimony.

[24] McCallum testimony; JX-11.

23

The parties by their conduct agreed to push back the timetable under their December 2, 2007 agreement, described above. McCallum made her payments later than required by the original agreement, as described above.

Pixley delayed his performance as well. While the parties' original agreement contemplated a completion date of January 15, 2008 for the vehicle, the evidence shows that Pixley delayed in acquiring the vehicle and in working on it, and could not possibly have completed the vehicle by January 15, 2008. On December 2, 2007, McCallum had gone with Pixley to a nearby car dealership and picked out the Chrysler 300 vehicle that Pixley was to acquire, convert to a limousine, and sell to McCallum. The Court finds that despite Pixley's having given McCallum assurances, in a telephone conversation on or about December 31, 2007, that the vehicle was nearing completion, Pixley did not even acquire the Chrysler 300 vehicle that he was to make into the limousine until February 15, 2008. And there is no credible evidence that Pixley caused any work to be done on the vehicle before that time. Pixley purchased the Chrysler 300 vehicle from the dealership on February 15, 2008. That is the date of Pixley's application for a title to the vehicle. And as the title application shows and Pixley admitted, Pixley paid $4,000.00 down for the vehicle, and financed the balance of his purchase of the vehicle with a $15,757.50 loan from Wells Fargo.[25] When the title to the vehicle was issued, in Pixley's name, on February 21, 2008, a security interest in favor of Wells Fargo was noted on the title.[26]

The relationship between McCallum and Pixley worsened considerably on April 7 and 8,

---

[25]  JX-15.

[26]  JX-14.

24

2008.  On April 7, 2008, McCallum met with Pixley, who told her that the vehicle was nearly

completed, but that he would need $1,600.00 from McCallum to complete the vehicle.  He said

that if McCallum paid him the $1,600.00, he would get the parts he needed to complete the

vehicle, and the vehicle would be completed in two days.[27]  In response to this, McCallum paid

the $1,600.00 in cash to Pixley, as described above.

The next day, on April 8, 2008, McCallum again met with Pixley. At that time,

McCallum learned for the first time about the Wells Fargo security interest in the vehicle, and

that the amount needed to pay off Wells Fargo and remove the security interest was $15,190.03.[28]

This, of course, was more than the $10,900.00 balance that McCallum still needed to pay under

the parties' agreement.  Pixley told McCallum that day that he would deliver the completed

vehicle, if McCallum would pay the amount needed to pay off Wells Fargo.  Pixley told

McCallum that this was the only way she would get the vehicle.[29]

McCallum initially decided that she would pay the extra amount demanded by Pixley, in

order to try to protect the $50,600.00 she had already paid toward the vehicle.  But she changed

her mind soon after April 8, 2008, because she learned that the work on the vehicle was *not*

completed, contrary to what Pixley had told her.  Unbeknownst to Pixley at the time, McCallum

went to Pixley's business location where the vehicle was being worked on, saw the vehicle, and

learned from talking to some workers there that there was a lot of work still to be done on the

---

[27] Tr. (Docket # 96) at 31-32 (McCallum testimony).

[28] JX-25; Tr. (Docket # 96) at 33-34 (McCallum testimony).

[29] Tr. (Docket # 96) at 34 (McCallum testimony).

25

vehicle.  McCallum also took pictures of the unfinished vehicle.[30]

Rightly concluding that she had been deceived by Pixley, McCallum then hired an attorney, Patrick Chatterton of Flint, Michigan.  Chatterton wrote three demand letters to Pixley, dated April 16, 2008, April 22, 2008, and May 2, 2008, all of which Pixley received by either hand delivery or fax.[31]  In the first two of these letters, McCallum's attorney stated that McCallum was ready, willing, and able to pay the $10,900.00 that she still owed under the parties' contract, and demanded that Pixley promptly get the Wells Fargo lien removed from the vehicle and tender delivery of the completed vehicle and title to the vehicle, at which time McCallum would pay the $10,900.00 still owing.[32]  In the third demand letter, dated May 2, 2008, McCallum's attorney demanded that Pixley either tender the completed vehicle or in the alternative, pay McCallum a full refund of the money she had paid (which the letter stated was $50,350.00).  That letter demanded an immediate written reply from Pixley.[33]

Pixley did not reply to this letter, in writing or otherwise; never tendered or offered to tender delivery of the completed vehicle and title to same; and never tendered or offered to tender, a refund of any of the money McCallum had paid.  On May 8, 2008, McCallum's attorney filed the state court lawsuit that led to the default judgment discussed in this opinion.[34]

The Court finds that Pixley knew that he had no right to simply keep all of McCallum's

---

[30]  JX-24; Tr. (Docket # 96) at 36-38 (McCallum testimony);

[31]  JX-21-23.

[32]  JX-21-22.

[33]  JX-23.

[34]  JX-1-8.

$50,600.00 without delivering the completed limousine. This was not a case of unwitting or innocent conversion by Pixley. Rather, Pixley knowingly and intentionally converted McCallum's money. He certainly knew what McCallum had paid, and knew that he could not *both* keep the vehicle himself and keep the $50,600.00 McCallum had paid for the vehicle. Yet this is what Pixley did, knowingly and intentionally.

The evidence shows that the Chrysler 300 vehicle's conversion to a limousine was later completed at some point in time, and that Pixley later advertised and used the vehicle in a limousine service that he partly owned, known as Tecumseh Trolley & Limousine Service.[35] And while Pixley knew that McCallum had not paid the remaining $10,900.00 of the purchase price for the vehicle, the Court finds that Pixley did not believe or have any good reason to believe that McCallum would not or could not pay that remaining amount *if* Pixley tendered the completed vehicle and clean title to the vehicle, as the parties' contract required of him, and as was repeatedly demanded by McCallum's attorney.

As already noted, the state court default judgment conclusively establishes that Pixley's failure to return the $50,600.00 that McCallum has paid, while simultaneously failing to deliver the completed limousine and clear title to same, was a conversion of McCallum's money. Under the circumstances, the Court finds that this conversion of McCallum's property was done by Pixley knowingly and intentionally, rather than unwittingly or innocently. As a result, the Court concludes that the conversion by Pixley was "willful" under § 523(a)(6).

### 2. "Malicious"

The Court also concludes that Pixley's conversion of McCallum's money was

---

[35] JX-9 at 2-3 (text description and picture of the vehicle).

"malicious" within the meaning of § 523(a)(6).  This element is established conclusively by the

state court default judgment, because it was "actually litigated" and "necessarily determined" by

the default judgment.  As noted above, the Court previously found that this element was "actually

litigated" by the default judgment.  *See* Part IV-C of this opinion; *McCallum*, 456 B.R. at 787.

And it was necessarily determined by the default judgment.  In establishing that Pixley

committed the tort of conversion of McCallum's property, the judgment necessarily established

that the conversion was "without just cause or excuse."  (As noted above, "malicious" under

§ 523(a)(6) means "in conscious disregard of one's duties or without just cause or excuse; it does

not require ill-will or specific intent." *See* Part IV-D of this opinion (quoting the Court's

summary judgment opinion, *McCallum*, 456 B.R. at 785.)

     For these reasons, the Court concludes that Pixley's debt to McCallum for conversion is

nondischargeable under § 523(a)(6).

### D.  The treble damages and attorney fee portion of the judgment debt

     As discussed above, Pixley's judgment debt to McCallum for conversion includes treble

damages and a specific amount for attorney fees, based on the Michigan conversion statute. The

Court agrees with McCallum's argument that, based on the Supreme Court's decision in *Cohen*

*v. De La Cruz*, 523 U.S. 213 (1998), the entire judgment amount, including the treble damages

and attorney fee portion, is nondischargeable under § 523(a)(6).  In *Cohen*, the Supreme Court

held that if a debtor is found to owe a debt that is nondischargeable for fraud under 11 U.S.C.

§ 523(a)(2)(A), then *all debt* that arises from or that is traceable to that fraud — including any

treble damages and attorney fees for such fraud imposed by applicable nonbankruptcy law — is

nondischargeable.  The holding and reasoning of *Cohen* applies to actions under § 523(a)(6).  *See*

*Suarez v. Barrett* (*In re Suarez*), 400 B.R. 732, 738-39 (B.A.P. 9th Cir. 2009), *aff'd*, 529 Fed. Appx. 832 (9th Cir. 2013); *Monsanto Co. v. Trantham* (*In re Trantham*), 304 B.R. 298, 309 (B.A.P. 6th Cir. 2004); *Bane v. Sorayama* (*In re Bane*), No. LA 08–1006–BB, 2010 WL 6451886, at *8 & nn.14-15 (B.A.P. 9th Cir. January 15, 2010); *HER, Inc. v. Barlow* (*In re Barlow*), 478 B.R. 320, 333-34 (Bankr. S.D. Ohio 2012), *aff'd,* 501 B.R. 685 (B.A.P. 6th Cir. 2013); *DirecTV, Inc. v. Karpinsky* (*In re Karpinsky*), 328 B.R. 516, 527-28 (Bankr. E.D. Mich. 2005); *R & L Pricecorp LLC v. Hall* (*In re Hall*), No. 12–3026, 2013 WL 1739658, at *2 (Bankr. E.D. Tenn. April 23, 2013).

As a result, the entire debt that Pixley owes to McCallum under the state court judgment — $157,028.03 plus post-judgment interest under applicable Michigan law — is nondischargeable under § 523(a)(6).[36]

### V.  Conclusion

For the reasons stated in this opinion, the Court will enter judgment for Plaintiff McCallum and against Defendant Pixley on Count III of McCallum's First Amended Complaint, determining that Pixley's entire debt to McCallum under the state court judgment is nondischargeable under 11 U.S.C. § 523(a)(6).  The Court will dismiss Counts I and II, and that portion of Count III of the First Amended Complaint based on 11 U.S.C. § 523(a)(2)(A), as moot.

**Signed on January 24, 2014**                     **/s/ Thomas J. Tucker**
                                                                        **Thomas J. Tucker**
                                                                        **United States Bankruptcy Judge**

---

[36]  Because of this conclusion, it is not necessary to discuss McCallum's claim of nondischargeability based on fraud under § 523(a)(2)(A).